**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
SHIRLEY SWEETING,                       :
                                        :          Civil Action No. 06-3983 (JAG)
                    Plaintiff,          :
                                        :                  **OPINION**
            v.                          :
                                        :
MICHAEL J. ASTRUE,[1] Commissioner of   :
Social Security,                        :
                                        :
                    Defendant.          :
_____:

**GREENAWAY, JR., U.S.D.J.**

Plaintiff Shirley Sweeting ("Plaintiff") seeks review of the Commissioner of Social

Security Administration's ("Commissioner") decision denying her application for Disability

Income Benefits ("DIB"), pursuant to 42 U.S.C. § 405(g).[2]  Plaintiff argues that the decision is

not supported by substantial evidence and should be reversed.  For the reasons set forth in this

Opinion, this Court finds that the Commissioner's decision is supported by substantial evidence

and should be affirmed.

_____

[1]  Michael J. Astrue became the Commissioner of Social Security on February 2, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been
substituted for Commissioner Jo Anne B. Barnhart as the defendant.  42 U.S.C. § 405(g).

[2] This section of the Social Security Act (hereinafter "Act") provides that any individual
may obtain a review of any final decision of the Commissioner made subsequent to a hearing to
which he or she was a party.  The federal district court for the district in which the plaintiff
resides is the appropriate place to bring such action. 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

On February 7, 2005, Plaintiff filed an application for DIB,[3] claiming that her "orthopedic, neurological, neuropsychiatric, psychiatric, psychological, pulmonary, and . . . related . . . disabilities" have prevented her from working since February 28, 2003.  (Tr. 45-49, 70.)[4]  Plaintiff specifically alleges that pain in her back, both knees, neck, and entire right arm prevents her from sitting or standing for long periods or manipulating her right hand. (Tr. 70.) She additionally claims that her anxiety, depression, headaches, dizziness, and inability to concentrate prevent her from working.  (Id.)  The Social Security Administration denied the Plaintiff's application initially and after reconsideration.  (Tr. 19-21, 24-26, 31-33.)  Plaintiff subsequently filed a timely request for a hearing, and, on May 30, 2006, appeared and testified before Administrative Law Judge Michael Lissek ("ALJ Lissek").  (Tr. 34, 36-37, 255-74.)  ALJ Lissek, evaluating Plaintiff's claim *de novo*, issued a ruling on June 19, 2006, denying her claim. (Tr. 10-18.)

ALJ Lissek made the following summary of his findings:

1.      The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2.      The claimant has not been engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. §§ 404.1520(b) and 404.1571 et seq.).

---

[3]  DIB are awarded only when a claimant with a sufficient number of quarters of insured employment has suffered such a mental or physical impairment that the claimant cannot perform substantial gainful employment for at least twelve months.

[4]  The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to such transcript.

3.      The claimant has the following severe impairments: osteoarthritis and obesity (20 C.F.R. § 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work or work involving lifting and carrying 20 pounds occasionally and 10 pounds frequently and sitting, standing, and walking for up to six hours in an eight hour workday.

6.      The claimant is capable of performing past relevant work as an administrative assistant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7.      The claimant has not been under a "disability," as defined in the Social Security Act, from February 28, 2003 through the date of this decision (20 C.F.R. § 404.1520(f)).

(Tr. 10-18.)

Based on these findings, ALJ Lissek concluded that Plaintiff was not eligible for DIB benefits under Sections 216(i) and 223(d) of the Social Security Act (the "Act"). (Tr. 18.) The Appeals Council denied Plaintiff's request for review on August 5, 2006, rendering ALJ Lissek's decision final. (Tr. 6-8.) Seeking reversal of the Commissioner's decision, Plaintiff filed the instant action, pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).

## II. <u>STATEMENT OF THE FACTS</u>

### A.    <u>Background</u>

Plaintiff was born on May 2, 1948, and has a high school education. (Tr. 259.) According to her testimony, Plaintiff stopped working in February 2003. (Tr. 260.) She was

terminated from her position as an administrative assistant at a day care center because her director felt "the job was a bit too much for [her]." (Id.) Plaintiff had worked at the day care center since October of 2000. (Id.) She estimates that she spent four to six hours per day sitting at a computer keyboard, and two hours standing, sometimes lifting boxes and files weighing about 15 to 25 pounds. (Tr. 260-62.)

Prior to her job at the day care center, Plaintiff worked as an administrative assistant at New Community Corporation from 1993 to 2000. (Tr. 262-63.) Plaintiff sat at a desk all day while performing payroll duties. (Tr. 263.) She maintains, however, that at times she had to lift heavy boxes weighing 30 pounds or more. (Id.) Plaintiff further testified that she worked at Macy's performing data entry from 1968 to 1993. (Tr. 264-65.) She estimates that she spent about six hours sitting and about two hours standing per day as a Macy's employee, and, at times, was required to lift boxes weighing 30 pounds or more. (Tr. 264.)

**B.    Claimed Disabilities**

Plaintiff claims that her disabilities arise from an injury to her left knee in 1989 and subsequent surgery on that same knee in 1992; an injury to her right knee in June 1998; injuries to her neck, back, and right shoulder sustained in an October 1998 vehicular accident; and injuries to her right ankle, lower back, and shoulder sustained when she fell in a parking lot in October 2005. (Tr. 265, 267.) Plaintiff maintains that although she continued working after the 1998 injury, her condition worsened over time and eventually prevented her from working altogether following her termination in February 2003. (Tr. 70, 79.) In her disability report, Plaintiff described the current extent of her disabilities: "I have pain in my back. I have pain in both knees. I have pain in my neck which radiates into my right arm and hands. I cannot stand

4

for long periods.  I cannot sit for long periods.  I have difficulty manipulating my right hand.  I

am nervous, worried, and depressed.  I have headaches.  I have dizziness.  I have difficulty

concentrating."  (Tr. 70.)  Plaintiff is five feet, one inch tall and weighs approximately 230

pounds.  (Tr. 69, 269.)

Plaintiff claims that due to the stiffness and pain in her knees and legs, she can stand for

only 20 to 30 minutes, or walk about a block, before she must stop due to the pain.  (Tr. 270.)

Plaintiff also complains of pain in her neck that at times prevents her from turning her neck to the

right.  (Tr. 268.)  Plaintiff further claims that pain in her right shoulder radiates to the fingers of

her right hand, making it difficult to type.  (Tr. 267.)  In her testimony before the ALJ, Plaintiff

stated that her hand becomes stiff and must be massaged.  (Tr. 267-68.)  Plaintiff also complains

of pain extending from her right knee to her ankle.  (Tr. 268.)

**C.**     **Medical Evidence Considered by the ALJ**

The record indicates that the Plaintiff has been evaluated by physicians on several

occasions.

1. Psychological Examinations

a.  *Dr. Yeon Choe*

On August 29, 2005, Dr. Yeon Choe, a State psychological consultant, examined

Plaintiff's mental status and concluded that Plaintiff displayed adequate cognitive function and

judgment.  (Tr. 166-67.)  Dr. Choe made the following observations: Plaintiff was fully oriented;

her speech was spontaneous, relevant and understandable; her mood was calm and euthymic; her

affect was appropriate; and her concentration was good.  (Tr. 166.)  Dr. Choe evaluated

Plaintiff's mental and physical condition according to the DSM-IV multiaxial scale.[5]  On Axis I,

Dr. Choe found depressive disorder, not otherwise specified (NOS).[6]  (Id.)  Dr. Choe's Axis V

analysis yielded a global assessment of functioning ("GAF") score of 58, indicating moderate

symptoms.[7]  (Tr. 167).

      b.  *Dr. W. Tillman*

On September 2, 2005, Dr. W. Tillman, a State psychological consultant, analyzed the

evidence of record.  (Tr. 209, 221.)  Dr. Tillman noted that Plaintiff had no history of psychiatric

treatment and no episodes of decompensation.[8]  (Tr. 221.)  Dr. Tillman also classified Plaintiff's

difficulties in performing daily activities, maintaining social functioning, concentration,

---

[5]  The DSM-IV multiaxial scale assesses an individual's mental and physical characteristics along five axes. Axis I assesses clinical disorders and Axis V assesses the subject's global assessment of functioning ("GAF").  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 27 (Text Revision 2000).

[6]  "When several core features of a particular diagnosis present themselves, but individual characteristics do not give rise to any one subcategory, a description of 'NOS,' meaning 'Not Otherwise Specified,' is given.  A diagnosis followed by 'NOS' does not put the principal diagnosis in doubt."  Honorable Jessie B. Gunther, *Reflections On The Challenging Proliferation Of Mental Health Issues In The District Court And The Need For Judicial Education*, 57 ME. L. REV. 541 n.43 (2005).

[7]  A GAF scale ranges from 0 to 100.  Generally, a lower score indicates a more serious mental disorder.  A score of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities."  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 27 (Text Revision 2000).  A GAF of 50-60 reflects a score within the range of symptoms described as "moderate," indicating occasional panic attacks and "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id.

[8]  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

persistence, and pace[9] as mild.[10]  (Tr. 219.)  Dr. Tillman concluded that Plaintiff's psychological impairments were non-severe and did not prevent gainful activity.  (Tr. 221.)

### c. *Dr. Carlos Jusino-Berrios*

On October 10, 2005, State agency medical consultant Dr. Carlos Jusino-Berrios reviewed Dr. Tillman's assessment of Plaintiff.  (Tr. 223-24.)  Dr. Jusino-Berrios affirmed Dr. Tillman's finding that Plaintiff's depressive disorder was non-severe.  (Tr. 224.)

### d. *Dr. Thomas Harding*

On February 21, 2006, State agency psychological consultant Dr. Thomas Harding also affirmed Dr. Tillman's assessment upon reviewing the record.  (Tr. 209.)

### 2. Physical Examinations

### a. *Dr. Z. Termanini*

On June 1, 1992, Plaintiff was hospitalized due to pain, swelling, and locking of her left knee.  (Tr. 135.)  Dr. Z. Termanini performed an arthroscopy of Plaintiff's left knee, finding a tear of the medial meniscus extending into the posterior horn.  (Tr. 137.)  Dr. Termanini then

---

[9]  "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

[10]  Functional Limitation analysis is used in the evaluation of mental impairments.  20 C.F.R. § 404.1520a.  An applicant's functional limitation is rated based on the extent to which impairment(s) interfere with the applicant's "ability to function independently, appropriately, effectively, and on a sustained basis."  Id. at (c)(2).  The degree of limitation is rated in the areas of (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  Id. at (c)(4).  In rating the first three functional areas, a five-point scale is used: "[n]one, mild, moderate, marked, and extreme."  Id.  In rating the fourth functional area, a four point scale is used: "[n]one, one or two, three, four or more."  Id.  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  Id.

performed a partial medial meniscectomy.[11]  (Id.)  Plaintiff "tolerated the procedure very well"

and was released in satisfactory condition.  (Id.)

> b. *Dr. Natalio Damien*

      On September 18, 1998, Dr. Natalio Damien examined a magnetic resonance image

("MRI") of Plaintiff's right knee.  (Tr. 139.)  Dr. Damien found (1) "mild diffuse thickening of

the medial collateral ligament suggestive of injury and possible partial tear . . . ;" (2) "mild

degenerative changes within the posterior horns of the medial and lateral menisci with no gross

evidence of a tear;" and (3) small joint effusion.  (Id.)

> c. *Dr. Jesse M. Cohen*

On December 5, 1998, Dr. Jesse Cohen examined MRIs of Plaintiff's cervical spine[12] and

right shoulder following Plaintiff's October 5, 1998 car accident.  (Tr. 140-41, 142.)  Dr. Cohen

found that Plaintiff's cervical spine exhibited: (1) straightened cervical lordosis;[13] (2) a small

central C5-C6 disc herniation; (3) no evidence of spinal stenosis or spinal cord compression; (4)

normal foramen magnum, brain stem, and intrinsically normal cervical and upper thoracic spinal

cord.  (Tr. 140.)  Upon viewing the MRI of Plaintiff's shoulder, Dr. Cohen also determined that

---

[11]  A meniscectomy is a "surgical excision of one of the crescent-shaped cartilages of the
knee joint.  It is performed when a torn cartilage results in chronic knee pain and in instability or
locking of the joint."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1078 (6th
ed. 2002).

[12]  The cervical spine is the part of the spine pertaining to the neck.  MOSBY'S MEDICAL,
NURSING, & ALLIED HEALTH DICTIONARY, 328 (6th ed. 2002).

[13]  Lordosis is defined as "an abnormal anterior concavity of the lumbar part of the back."
MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1021 (6th ed. 2002).

Plaintiff exhibited (1) degenerative changes of the right acromioclavicular joint[14] with impingement, bursitis,[15] and rotator cuff tendinitis; (2) no evidence of complete rotator cuff tear, cuff atrophy, or retraction; and normal glenoid labrum,[16] biceps tendon and humeral head.  (Tr. 141.)

        d.  *Dr. Edmund O. Matzal*

    On December 17, 1998, Dr. Edmund O. Matzal examined Plaintiff, who had complained of neck and shoulder pain since her October 5, 1998 car accident.  Dr. Matzal concluded that Plaintiff suffered from mild C6 cervical radiculitis[17] with signs of cervical sprain and strain, trigger points, and reduced range of motion.  (Tr. 144.)  Dr. Matzal also found that the Plaintiff suffered from a right supraspinatus[18] tendonitis and right subdeltoid bursitis.  (Id.)  Nerve conduction studies indicated possible carpal tunnel syndrome in Plaintiff's right side.  (Id.)  Given the nature of Plaintiff's symptoms, Dr. Matzal concluded that the prognosis for significant recovery was fair.  (Tr. 145.)

---

[14]  The acromioclavicular joint is a gliding joint between the clavicle and scapula that forms the highest point of the shoulder.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 24 (6th ed. 2002).

[15]  Bursitis is defined as "inflammation of the bursa, the connective tissue surrounding a joint."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 257 (6th ed. 2002).

[16]  The glenoid labrum is "a ring of fibrocartilage attached to the margin of the glenoid cavity of the scapula to increase its depth."  Stedman's Medical Dictionary, WL STEDMANS 220840 (27th ed. 2000).

[17]  Radiculitis is "an inflammation involving a spinal nerve root, resulting in pain and hyperesthesia."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1458 (6th ed. 2002).

[18]  The supraspinatus is a muscle near the top of the spine.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1660 (6th ed. 2002).

e. *Dr. Enrique Hernandez*

Dr. Hernandez conducted electrodiagnostic testing on Plaintiff on May 24, 1999, and found that she suffered from (1) early right carpal tunnel syndrome; (2) right C5-C6 radiculopathy with double-crush syndrome; and (3) R/O bilateral upper dorsal radiculopathy. (Tr. 161.)  In elecrodiagnostic tests performed on Plaintiff on May 28, 1999, Dr. Hernandez found absent ulnar responses to stimulation consistent with C7 radiculopathy. (Tr. 156.)

f. *Dr. Samuel Wilchfort*

On September 1, 2005, consultive physician Dr. Samuel Wilchfort examined Plaintiff at the State agency's request.  (Tr. 168-70.)  Dr. Wilchfort made the following summary of Plaintiff's medical problems: (1) hypertension; (2) moderate obesity; (3) "[a]rthritic complaints, mostly in the right shoulder . . . also in the knees, particularly in the right.  She is complaining of some cervical spine pain.  In the LS spine she is not complaining of pain as much, she just cannot bend over because it hurts her right knee;" (4) high cholesterol and taking Lipitor; and (5) probable acid reflux, and taking Aciphex.  (Tr. 170.)

Dr. Wilchfort observed that Plaintiff had normal muscle strength, with full range of motion in her hands, wrists, elbows, ankles, and hips.  (Tr. 169.)  In her right shoulder, where Plaintiff complained of pain, she was able to "forward elevate and abduct her arm to about 90 degrees."  (Id.)  Though Plaintiff complained of some pain in her cervical spine, Dr. Wilchfort found her cervical spine flexion and extension normal.  (Id.)  Plaintiff could bend her lumbosacral spine to 50 degrees before complaining of pain in her right knee.  (Id.)  An x-ray of the Plaintiff's lumbar spine showed mild exaggerated lordosis, but Dr. Wilchfort concluded that Plaintiff's lumbar spine was essentially normal, with intact disc spaces and no significant

10

osteophyte[19] formation.  Plaintiff could flex her right knee fully with some pain and mild

crepitus.[20]  (Id.)  Plaintiff could flex and extend her left knee fully with no significant pain.  (Id.)

Dr. Wilchfort noted that Plaintiff walked with a normal gait, could walk on her toes and heels,

used no assistive devices, and had no trouble climbing onto or off of the examination table.  (Id.)

Dr. Wilchfort further noted that Plaintiff exhibited a history of hypertension, for which

she was taking 5 mg of Norvasc twice a day.  (Tr. 168.)  Plaintiff's blood pressure was measured

at 150/90 mm Hg.  (Id.)  Plaintiff also took 20 mg Lipitor per day to help control her high

cholesterol.  (Id.)  Otherwise, Plaintiff's heart was normal and her electrocardiogram was

unremarkable.  (Tr. 169.)  Dr. Wilchfort observed that Plaintiff's peripheral pulses, cranial

nerves, reflexes, vibratory sense, and mental status were all normal.  (Id.)

### g.  *Dr. Jeffrey D. Blonstein*

On September 7, 2005, Dr. Jeffrey D. Blonstein filed a diagnostic radiology report after

viewing x-rays of Plaintiff's knees.  (Tr. 171.)  He concluded that Plaintiff had mild osteoarthritis

with no fracture, dislocation, or joint effusion.  (Id.)

### h.  *Dr. Burton Gillette*

On September 13, 2005, State medical consultant Dr. Burton Gillette evaluated Plaintiff's

residual functional capacity after reviewing evidence in the record.  (Tr. 225-32.)  Dr. Gillette

concluded that Plaintiff could occasionally lift or carry 20 pounds, and frequently lift or carry 10

pounds. (Tr. 226.)  Dr. Gillette further concluded that the Plaintiff was capable of standing or

---

[19]  An osteophyte is a bony outgrowth found near a joint.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1246 (6th ed. 2002).

[20]  Crepitus is defined as a clicking sound in joints.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 447 (6th ed. 2002).

walking for about 6 hours in an 8-hour workday, or sitting for about 6 hours in an 8-hour workday. (Id.) On February 21, 2006, a State medical agency consultant[21] reviewed Plaintiff's record and affirmed Dr. Gillette's assessment of Plaintiff's residual functional capacity ("RFC"). (Tr. 231-32.)

> i. *Dr. T. Vijayanathan*

On December 9, 2005, Dr. Vijayanathan examined MRIs of Plaintiff's lumbar spine and cervical spine. (Tr. 176-77.) In Plaintiff's cervical spine, Dr. Vijayanathan found slight spondylotic ridging at C5-C6 levels, a small central posterior disc herniation at C6-C7 level, and no spinal cord abnormalities. (Tr. 177.) In Plaintiff's lumbar spine, Dr. Vijayanathan found bilateral hypertrophic facet joint disease[22] at L3-L4, L4-L5, and L5-S1 levels, but no evidence of lumbar disc herniation or significant spinal stenosis. (Tr. 176.)

### III.  DISCUSSION

#### A.      Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). This Court must affirm the Commissioner's decision if it is "supported by substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Servs., 841

---

[21]  The name of the consultant who affirmed Dr. Gillette's findings on February 21, 2006 is, however, illegible. That consultant produced a signature on an adjacent page to a stamp reading "I have reviewed all the evidence in the file and the assessment of 9/13/05 is affirmed, as written." (Tr. 231-32.)

[22]  Facet joint disease is an enlargement of the facet joints, which are located between articular processes of the vertebrae. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 651, 851(6th ed. 2002).

F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom (citing

Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

        In determining whether there is substantial evidence to support the Commissioner's

decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses

and expert opinions of treating and examining physicians on subsidiary questions of fact; (3)

subjective evidence of pain testified to by the claimant and corroborated by family and neighbors;

and (4) the claimant's educational background, work history and present age."  Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J.

1981). Where there is substantial evidence to support the Commissioner's decision, it is of no

consequence that the record contains evidence that may also support a different conclusion.

Blalock, 483 F.2d at 775.

**B.    Statutory Standards**

        The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. §

13

423(d)(5).  To qualify for DIB, a claimant must first establish that he is needy and aged, blind, or

"disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if he is unable to

"engage in substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A);

see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether

a claimant's impairment is so severe that he "is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see

also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective

complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. §

423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical,

physiological or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.      The Five-Step Evaluation Process And The Burden of Proof**

        Determinations of disability are made by the Commissioner, pursuant to the five-step

process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity.[23]  20 C.F.R. §

404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled,"

and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

---

[23]  Substantial gainful activity is "work that involves doing significant and productive physical or
mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

At step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit Court of Appeals found that to deny a claim at step three, the ALJ must specify which listings[24] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the court noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  (Id.)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth

---

[24] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant

listing." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional

capacity to perform his past relevant work. 20 C.F.R. § 404.1520(e). If the claimant is able to

perform his past relevant work, he will not be found disabled under the Act. In Burnett, the

Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional
> capacity enables her to perform her past relevant work. This step involves three
> substeps: (1) the ALJ must make specific findings of fact as to the claimant's
> residual functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ must
> compare the residual functional capacity to the past relevant work to determine
> whether claimant has the level of capability needed to perform the past relevant
> work.

Burnett, 220 F.3d at 120. If the claimant is unable to resume his past work, and his

condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

demonstrate that there are other jobs existing in significant numbers in the national economy

which the claimant can perform, consistent with his medical impairments, age, education, past

work experience, and residual functional capacity. 20 C.F.R. § 404.1560(c)(1). If the ALJ finds

a significant number of jobs that the claimant can perform, the claimant will not be found

disabled. Id.

When the claimant has only exertional limitations, the Commissioner may utilize the

Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet his

burden of establishing the existence of jobs in the national economy. These guidelines dictate a

16

result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age, education level, work history, and residual functional capacity. These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for a given combination of vocational factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b). When the vocational factors coincide with all the criteria of a rule, the rule directs a conclusion as to whether an individual is disabled. 20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983). The claimant, however, may rebut any finding of fact as to a vocational factor. 20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled." Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). "The combined impact of the impairments will be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003). The burden, however, remains on the claimant to prove that the impairments in combination are severe enough to qualify him for benefits. See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [claimant] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit

17

Court of Appeals applies its procedural requirements, as well as its interpretation of <u>Jones</u>, to every step of the decision.  <u>See e.g.</u>, <u>Rivera v. Comm'r</u>, No. 05-1351, 2006 U.S. App. LEXIS 2372, at *3 (3d Cir. Jan. 31, 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  <u>Id.</u>

**D**.      **ALJ Findings**

ALJ Lissek applied the five-step evaluation process to determine that Plaintiff was not disabled within the meaning of the Act.  (Tr. 12.)  ALJ Lissek first determined that Plaintiff satisfied step one of the evaluation process because she had not engaged in substantial activity during the relevant time period.  (Tr. 14.)

At step two of the evaluation, ALJ Lissek determined that Plaintiff suffers from two severe impairments: osteoarthritis and obesity.  (<u>Id.</u>)  ALJ Lissek noted Plaintiff's meniscal tear of the left knee and subsequent arthroscopy and partial medial meniscectomy in 1992.  (<u>Id.</u>)  ALJ Lissek also noted that Plaintiff reported pain in her neck, right shoulder, and right knee following her 1998 vehicular accident.  (<u>Id.</u>)  ALJ Lissek then discussed the objective medical findings made by doctors investigating Plaintiff's complaints, including the MRIs and electrodiagnostic tests of Plaintiff's right knee, cervical spine, and right shoulder, indicating a small C5-6 disc herniation, mild radiculitis, and degenerative changes in the right acromioclavicular joint.  (<u>Id.</u>)  ALJ Lissek observed that based on the medical data, Dr. Matzal concluded that Plaintiff's prognosis for recovery following her vehicular accident was fair.  (<u>Id.</u>)  ALJ Lissek then noted that in May 1999, Plaintiff underwent a follow-up electromyogram with Dr. Hernandez, confirming right C5-6 radiculopathy.  (Tr. 15.)  The opinion stated that Plaintiff was prescribed

18

Celebrex and was noted to have been working.  (Id.)

ALJ Lissek thereafter discussed Plaintiff's August 2005 independent consultative examination with Dr. Choe.  (Tr. 15.)  ALJ Lissek noted that Dr. Choe found that Plaintiff had no significant mental limitations, exhibiting a calm and euthymic mood with appropriate affect, spontaneous speech, and adequate cognitive function.  (Id.)  ALJ Lissek's opinion further stated that Plaintiff told Dr. Choe she was taking medication and seeing her physician every one or two months.  (Id.)

ALJ Lissek then discussed Plaintiff's consultative physical examination with Dr. Wilchfort, performed in September 2005.  (Id.)  ALJ Lissek noted that Plaintiff's main complaint was arthritis.  (Id.)  ALJ Lissek's discussion of Dr. Wilchfort's findings reads in relevant part: "The claimant was noted to be obese, but Dr. Wilchfort reported that she had no trouble getting off the table or ambulating.  The claimant expressed discomfort with her right shoulder and right knee, but she was able to elevate her right shoulder to 90 degrees and flex her knees fully."  (Id.) Later in his opinion, at step four, ALJ Lissek noted that Dr. Wilchfort observed no limiting conditions in the Plaintiff.  (Tr. 17.)

ALJ Lissek next discussed the MRIs performed in December 2005 by Dr. Vijayanathan. (Tr. 15, 177.)  ALJ Lissek noted that the MRI showed bilateral hypertrophic facet joint disease in Plaintiff's lumbar spine at L3-S1, but did not show evidence of lumbar disc herniation or spinal stenosis.  (Id.)  ALJ Lissek added that the MRI of Plaintiff's cervical spine "revealed only slight spondylotic ridging at C5-6 and a small posterior disc herniation at C6-7" with no spinal cord abnormalities.  (Id.)

In concluding his step two analysis, ALJ Lissek determined that Plaintiff's impairments

19

relating to hypertension and depression have no more than a slight effect on her ability to do work, and are thus non-severe.  (Tr. 15.)  ALJ Lissek noted that throughout the record, evidence established that Plaintiff's hypertension can be characterized as mild at worst, and is managed with medication  (Id.)

Regarding Plaintiff's mental status, ALJ Lissek stated that the medical evidence shows that Plaintiff suffers only from a "slight affective disorder," as defined by listing 12.04A1, Appendix 1, Subpart P, Regulations No. 4.[25] Evaluating Plaintiff's condition according to the B criteria of the listing, ALJ Lissek concluded that Plaintiff does not experience marked[26] limitations in functioning, but rather only "mild limitations in restrictions of activities of daily living; mild limitations in difficulties in maintaining social functioning; mild deficiencies of concentration, persistence or pace for performing simple tasks; and no episodes of decompensation when performing simple tasks."  (Tr. 15-16.)  ALJ Lissek also concluded that Plaintiff did not meet the C criteria.  (Id.)  ALJ Lissek thus found that Plaintiff suffered no severe

---

[25]  A claimant is deemed to suffer from an affective disorder of disabling severity if she meets the requirements of listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The claimant must fulfill both the A and B criteria enumerated in the listing, or else the C criteria. Id.  To fulfill the A criteria, the claimant must suffer from one of the listed medically-determinable depressive or manic syndromes. Id.  To fulfill the B criteria, the claimant must, as a result of her illness, exhibit two of the following: (1) marked restrictions in activities of daily living; (2) marked restrictions in social functioning; (3) marked restrictions in concentration, persistence, or pace; or (4) have exhibited repeated episodes of decompensation. Id. To fulfill the C criteria, the claimant must exhibit a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities," along with additional symptoms specifically enumerated in the listing . Id.

[26]  "Where we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

mental impairments.  (Tr. 15.)

At step three of the five-step evaluation, ALJ Lissek concluded that Plaintiff's impairments, alone or in combination, do not meet or exceed the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  ALJ Lissek noted that Plaintiff failed to demonstrate the criteria required of each listing in section 1.00.  (Tr. 16.)  Plaintiff's proffered medical evidence also failed to establish that she is unable to ambulate or perform fine and gross movements effectively due to dysfunction of a joint, as required by Listing 1.02.  (Id.)  Likewise, Plaintiff failed to establish that she suffered from any of the listed spinal disorders enumerated in Listing 1.04.  (Id.)

At step four of the evaluation, ALJ Lissek concluded that Plaintiff possessed the RFC to perform a full range of light work; he found Plaintiff capable of lifting and carrying 10 pounds occasionally and 20 pounds often, and walking, standing or sitting for up to six hours in an eight-hour workday.  (Id.)  In reaching his conclusion, ALJ Lissek "based [his] findings on the objective medical evidence and the claimant's own testimony," and relied on "opinions of the physicians at the state agency . . . , [Drs. Gillette and Tillman, who] found that the claimant retained the ability to perform a full range of light work with no severe mental impairments."  (Tr. 17.)  ALJ Lissek determined that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms is not entirely credible."  (Tr. 16.)

ALJ Lissek relied on the following factual findings to discount Plaintiff's credibility and to support his conclusion that she is capable of performing light work: (1) Plaintiff visits her

treating physician "only about once every three to four months"; (2) Plaintiff's hypertension is controlled with medication; (3) Plaintiff presented no statement from any treating or examining physicians suggesting that her condition causes the physical limitations to the extent alleged; (4) Dr. Wilchfort found that Plaintiff has no severely limiting conditions.  (Tr. 16-17.)

Finally, ALJ Lissek found that Plaintiff performed significant past relevant work as an administrative assistant and she retains the physical and mental ability to continue working as an administrative assistant.  (Tr. 17.)  Plaintiff testified that at her previous place of employment, she sat about six hours per day, stood about two hours, and rarely was asked to carry more than about 10 pounds.  (Id.)  Additionally, as ALJ Lissek noted, the Dictionary of Occupational Titles characterizes the job of administrative assistant as sedentary, requiring lifting of no more than 10 pounds and involving sitting for most of the day.  (Tr. 17, 208.)  ALJ Lissek concluded that because Plaintiff was deemed capable of performing light work, she is also able to return to her past work as an administrative assistant.  (Id.)

Through the five-step analysis described supra, ALJ Lissek concluded that the Commissioner correctly denied Plaintiff's claim for DIB.

**E.    Analysis**

Plaintiff requests that this Court reverse ALJ Lissek's ruling, or remand for a full and fair consideration of her claim.  (Pl.'s Br. at 16.)  Plaintiff argues that: (1) ALJ Lissek failed to evaluate properly Plaintiff's subjective complaints of pain; (2) ALJ Lissek's determination of Plaintiff's RFC was procedurally improper; and (3) ALJ Lissek's determination of Plaintiff's RFC improperly relied on flawed medical opinion evidence.  (Pl.'s Br. at 11-15.)  Because Plaintiff does not object to ALJ Lissek's findings at steps one through three of the sequential

evaluation process or dispute ALJ Lissek's findings regarding her mental impairments, this Court's review is limited in scope to the ALJ's determination of Plaintiff's RFC based on her physical impairments at step four.  (Id.)

>    1.    *Did ALJ Lissek evaluate Plaintiff's subjective complaints of pain properly?*

Plaintiff challenges ALJ Lissek's finding of diminished credibility regarding her subjective complaints of pain on two separate grounds.  First, Plaintiff argues that ALJ Lissek "did not make the appropriate correlation" between Plaintiff's subjective complaints of right shoulder, arm and hand pain and the objective medical evidence.  (Pl.'s Br. at 12.)  Second, Plaintiff argues that ALJ Lissek's credibility determination lacks the requisite level of specificity.  (Pl.'s Br. at 11.)

The Social Security Regulations provide the standard an ALJ must use for evaluating a claimant's subjective complaints of symptoms such as pain.  Caruso v. Comm'r of Soc. Sec. 99 F. App'x 376, 380 (3d Cir. 1999).  The ALJ is first required to evaluate whether the claimant suffers from a medically-determinable impairment capable of causing the alleged symptoms.  SSR 96-7P.  If the claimant suffers from such an impairment, the ALJ must then make a separate determination as to whether the intensity, persistence, or functionally limiting effects of the symptoms preclude the claimant from working.  Id.  If the extent of the claimant's pain or other symptoms exceed what can be substantiated by objective medical evidence, the ALJ must evaluate the claimant's credibility based on her statements and all the other evidence in the case record.  Id.  "This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  Even if a claimant's complaints are consistent with

some medically deducible impairment, the ALJ may discount her subjective complaints of pain as not credible if he has any rational basis to do so.  Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd per curiam 85 F.3d 611 (3d Cir. 1996).  Furthermore, the ALJ is instructed to investigate the following factors, *inter alia*, in making a credibility determination: (1) the consistency of the claimant's statements with the medical signs and laboratory findings; (2) treatment and medication the claimant receives for pain; (3) the internal consistency of the claimant's statements; and (4) the individual's daily activities.  SSR 96-7P; C.F.R. § 494.1529(c); see also Scatorchia 137 F. App'x at 471 (finding an absence of medical opinions supporting subjective complaints of pain and incapacitation may support an ALJ's adverse credibility finding).

First, this Court finds that ALJ Lissek's credibility determination was supported by substantial evidence.  ALJ Lissek stated that his credibility determination was based on the lack of medical support for Plaintiff's complaints, on the discrepancies between Plaintiff's subjective complaints and Dr. Wilchfort's observations, and on the fact that Plaintiff visited her doctor once every three to four months.  (Tr. 16-17.)  Regarding Plaintiff's allegation that ALJ Lissek improperly evaluated her right shoulder, arm, and hand pain, Plaintiff produced no medical opinion suggesting that her arthritis caused any severe limitations in the use of her hand.  In fact, Dr. Wilchfort found that Plaintiff had full range of motion in her hands, wrists, and elbows.  (Tr. 169, 259.)  Dr. Wilchfort also found that Plaintiff could ambulate effectively, had no trouble getting on or off the examining table, and had full range of motion in her neck, hips, knees, and ankles.  (Tr. 169.)

Furthermore, ample additional evidence in the record beyond that expressly referenced by

ALJ Lissek supports his credibility determination.  The record shows that Plaintiff is able to prepare lunch, go food shopping, attend church, and drive to the doctor's office. (Tr. 271-73.) These activities belie her claims of total disability.  See Scatorchia, 137 F. App'x at 471. Plaintiff also provided highly divergent statements concerning the amount of time, on average, she spent standing up at her last place of employment; on one form, she estimated that she stood for eight hours per day, and in her testimony, she estimated she stood for 4 to 6 hours.  (Tr. 71, 261-62.) Under the applicable standard of review, this Court need only determine whether substantial evidence supports the ALJ's credibility determination. 42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard, 841 F.2d at 59.  Based on the aforementioned facts supporting ALJ Lissek's decision, this Court finds that substantial evidence supports his finding that Plaintiff's subjective complaints of pain were not entirely credible.

Second, Plaintiff claims that the ALJ's decision failed to provide "specific reasons for the credibility finding, supported by evidence in the case record," and did not "specifically state the weight given to the individual's statements," as required by Social Security Ruling 96-7P.  (Pl.'s Br. at 11.)  This Court disagrees.  ALJ Lissek satisfied the above-quoted language of Social Security Ruling 96-7.  ALJ Lissek specified that he found Plaintiff's "statements concerning the intensity, duration, and limiting effects of these statements is not entirely credible," thus indicating, with specificity, the weight he gave them in his analysis.  (Tr. 16.)  ALJ Lissek also explained that his credibility determination was based on specific facts, including the infrequency of Plaintiff's medical treatment as well as on the discrepancies between Plaintiff's subjective complaints of debilitating pain and Dr. Wilchfort's observations, which suggested that Plaintiff's impairments did not cause such severe pain as to limit her ability to function.  (Tr. 16-17.)

Plaintiff also made a separate objection to the ALJ's lack of specificity when evaluating the credibility of Plaintiff's statements regarding the pain in her shoulder and right arm.  (Pl.'s Br. at 12.)  This Court finds that ALJ Lissek's credibility determination clearly extended to all of Plaintiff's claims of completely debilitating pain, which necessarily includes her claims of shoulder and arm pain.  ALJ Lissek stated that "[t]here is no statement from any treating or examining source that the claimant's condition causes *any marked limitations*," and "Dr. Wilchfort found *no severely limiting conditions*."  (Tr. 16-17 (emphasis added).)  Because his stated reasons for rejecting Plaintiff's complaints of shoulder and arm pain were the same as those for all of Plaintiff's subjective complaints – that the extent of the alleged pain was unsupported by the record and in conflict with Dr. Wilchfort's findings – ALJ Lissek needed no further explanation tailored to Plaintiff's shoulder and arm pain.

Plaintiff also claims that "there is a lack of specificity in this findings [sic] as to what testimony is credible and what testimony is not credible."  (Pl.'s Br. at 11.)  Plaintiff, however, cites no case or statute indicating that a credibility analysis requires such detail.  (Id.)  Social Security Ruling 96-7P states that an adjudicator "*may* determine that none, some, or all of a claimant's statements are . . . credible . . .," but neither it nor 20 C.F.R. § 404.1529 suggests that the ALJ must distinguish which of the claimant's individual statements have been deemed incredible.  SSR 96-7P (emphasis added).  Rather, Jones instructs that the ALJ need not "use particular language or adhere to a particular format in conducting his analysis," 364 F.3d at 505, and that an ALJ's explanation need only be so detailed as to permit meaningful judicial review.  See Rivera v. Comm'r, 2006 U.S. App. LEXIS 2372, at *3 .  This Court finds that ALJ Lissek sufficiently explained his reasoning and the factual basis underlying his adverse credibility

finding so as to permit meaningful appellate review.

### 2. Did the ALJ properly determine Plaintiff's RFC?

Plaintiff claims that ALJ Lissek's RFC determination "appears to be no more than a rubber stamp of what had been considered at the paper review level. . . . The hearing process envisions a *de novo* review, and the appearance, herein, is indicative of a rubber stamp review." (Pl.'s Br. at 13.)  This Court interprets Plaintiff's statement to allege either that ALJ Lissek did not follow the proper statutory protocols in determining Plaintiff's RFC, or that ALJ Lissek's determination of Plaintiff's RFC lacks the required level of detail.  In either case, this Court finds that ALJ Lissek's determination of Plaintiff's RFC, though terse, adhered to the proper protocols and provided sufficient detail to permit meaningful review.

An ALJ is given the sole responsibility of determining Plaintiff's RFC, which is an administrative assessment of a claimant's ability to work.  20 C.F.R. § 1527(e)(2); 20 C.F.R. § 404.1545; SSR 96-8P.  The ALJ assesses a claimant's RFC based on all the relevant evidence in the case record, including medical opinions concerning a claimant's physical abilities, objective medical data, and medical diagnoses.  20 C.F.R. § 404.1545.  The claimant is responsible for providing evidence used in the ALJ's determination, and bears the burden of demonstrating an inability to return to her past relevant work.  Id.; Adorno v. Shalala, 40 F.3d 43, 46 (3d. Cir. 1994).  The ALJ uses these medical sources "to provide evidence, including opinions on the nature and severity of [a claimant's] impairments.  Although [the ALJ] consider[s] opinions from medical sources on issues such as . . . residual functional capacity, . . . the final responsibility for deciding [RFC] is reserved to the Commissioner."  20 C.F.R. § 404.1527.  While this Court is bound by the ALJ's RFC finding as long as it is supported by substantial evidence, Stunkard, 841

F.2d at 59, Burnett and its distinguishing cases require that the ALJ set forth the facts and reasoning underlying his conclusions in sufficient detail so as to permit meaningful judicial review.  220 F.3d at 119.  (At step three the ALJ's opinion must include sufficient explanation as to permit meaningful judicial review); Rivera, 2006 U.S. App. LEXIS 2372, at *3 (The Burnett requirement applies at every step of the evaluation process).

ALJ Lissek clearly stated that his evaluation of Plaintiff's RFC was based on two critical findings.  First, ALJ Lissek noted that Plaintiff presented no statements from any physician, treating or otherwise, that would indicate she experienced such debilitating pain as to preclude her from working.  (Tr. 16.)  The only medical opinions provided by Plaintiff regarding her impairments affecting her ability to work are those of the State agency medical consultants, who concluded that she was capable of performing light work, contrary to her own contentions.  (Tr. 225-32.)  Likewise, the State psychological consultants concluded that Plaintiff's mental impairments were non-severe.  (Tr. 221.)  Because the claimant carries the burden of proof at step four, ALJ Lissek properly relied on the absence of medical evidence suggesting that Plaintiff experiences debilitating pain to the extent alleged.  See Adorno, 40 F.3d at 46; 20 C.F.R. § 404.1545(a)(3).

Second, ALJ Lissek discounted Plaintiff's testimony – the only evidence supporting her claims as to the extent of her pain – as not credible.  Otherwise, ALJ Lissek reviewed the most pertinent objective medical information, including MRIs indicating Plaintiff suffered from radiculopathy, bilateral hypertrophic facet joint disease, and spondylotic ridging.  (Tr. 14-16.)  In assessing the extent of the limitations caused by these objectively determinable impairments, ALJ Lissek, rejecting Plaintiff's testimony, relied on the opinions of State medical consultants,

28

who concluded that the evidence as a whole suggested that Plaintiff's physical limitations are far less severe than Plaintiff contends.  (Tr. 16-17.)  ALJ Lissek also emphasized that Dr. Wilchfort, the only physician to perform a functional examination of Plaintiff, found no severely limiting conditions.  (Id.)  ALJ Lissek's analysis provided sufficient detail for meaningful review by explaining that he found Plaintiff's statements not credible in light of the uncontested medical opinions of the State medical consultants.

### 3.     Did ALJ Lissek rely on flawed medical opinion evidence improperly in determining Plaintiff's RFC?

Plaintiff argues that ALJ Lissek should not have relied on the RFC assessments of the State medical consultants because the qualifications of the reviewing physicians were unclear. (Pl.'s Br. at 13-15.)  Plaintiff also contends that the record reviewed by the State medical consultants in making an RFC evaluation was incomplete because it did not include Plaintiff's December 2005 MRI, and as such, ALJ Lissek should not have relied on that evaluation in making his own RFC determination.  (Pl.'s Br. at 13-15.)

First, Plaintiff argues that ALJ Lissek should not have relied on the RFC assessments of the State medical consultants because the qualifications of Harry Prophete[27] are unknown.  (Pl.'s Br. at 13.)  Plaintiff's argument is inapposite. ALJ Lissek stated that he relied on the conclusions of the medical consultants found in Exhibits 13F and 14F, whereas Harry Prophete's case

---

[27] Harry Prophete completed a form SSA-416 dated September 20, 2005, in which he concluded that the State medical consultant's RFC determination was compatible with the medical evidence.  (Tr. 135.)  The form does not state specifically that Mr. Prophete is a physician, but the fact that he reviewed medical evidence and completed a SSA-416 form suggests that he is a State medical consultant.  Nevertheless, ALJ Lissek did not indicate that he gave weight to Harry Prophete's opinion, so this Court need not determine whether ALJ Lissek's reliance on a medical opinion absent a statement of the expert's qualifications was error.

analysis is found in Exhibit 9F.  (Tr. 17, 175.)  Exhibit 13F consists of Dr. W. Tillman's

assessment of Plaintiff's psychological disorders as non-severe based on the evidence in the

record, Dr. Harding's affirmation of Dr. Tillman's assessment, and Dr. Jusino-Berrios' review of

Dr. Tillman's assessment.  (Tr. 209-24.)  Exhibit 14 consists of Dr. Gillette's September 13,

2005 physical RFC assessment finding Plaintiff capable of light work and an affirmation of Dr.

Gillette's assessment by another State consultant on February 21, 2006.  (Tr. 231-32.)  ALJ

Lissek's opinion indicated that he did not rely on or consider Harry Prophete's case analysis in

determining Plaintiff's RFC, but rather relied upon those of Drs. Tillman, Harding, Jusino-

Berrios, and Gillette.  (Tr. 17.)

       Second, Plaintiff contends that Dr. Gillette's "qualifications . . . are not of record,"

presumably meaning that ALJ Lissek erred in relying on Dr. Gillette's opinion in making his own

RFC determination.  (Pl's Br. at 13.)  Granted, ALJ Lissek did not report the extent of Dr.

Gillette's medical expertise, but this Court finds that his failure to do so is harmless error.  The

record indicates that Dr. Gillette is a disability determination services physician, (Tr. 3,) and, as

such, he is qualified to provide the ALJ with his medical opinion. 20 C.F.R. §404.1527(f)(2)(i)

("State agency medical and psychological consultants . . . are highly qualified physicians and

psychologists who are also experts in Social Security disability evaluation.  Therefore,

administrative law judges must consider [their] findings . . . as opinion evidence.").

Furthermore, Plaintiff presented no medical opinion evidence to contradict Dr. Gillette's

evaluation, so ALJ Lissek was therefore entitled to use it as evidence without providing a

detailed explanation of why he chose to give it weight over contrary evidence.  20 C.F.R. §

404.1527(c)(1) ("If all the evidence we receive, including any medical opinion(s), is consistent,

and there is sufficient evidence for us to decide whether you are disabled, we will make our

determination based on that evidence.").  An ALJ is only called on to weigh the evidence when it

is inconsistent internally or with other evidence.  20 C.F.R. § 404.1527(c)(2).  This Court finds

that ALJ Lissek's plain statement acknowledging the expertise of the State consultants was

sufficient, given the lack of contradictory medical evidence advanced by Plaintiff.[28]  (Tr. 17.)

Third, Plaintiff claims that ALJ Lissek improperly relied upon Dr. Gillette's RFC

evaluation because it was completed without the benefit of Plaintiff's December 2005 MRIs.

(Pl.'s Br. at 14.)  Those MRIs indicated bilateral hypertrophic facet joint disease with no lumbar

disc herniation or spinal stenosis in Plaintiff's lumbar spine, and slight spondylotic ridging and a

small posterior disc herniation in Plaintiff's cervical spine.[29]  (Tr. 15, 176-77.)  This Court finds

that even if Dr. Wilchfort's RFC evaluation were not reviewed and affirmed by a State consultant

following the inclusion of Plaintiff's December 2005 MRIs, ALJ Lissek's reliance on it as

relevant evidence in making his own RFC determination is permissible.  The ALJ, not the State

medical consultant, is responsible for making the ultimate determination of a claimant's RFC.

---

[28]  It is significant that Dr. Gillette's RFC evaluation was uncontested.  Had ALJ Lissek
failed to report Dr. Gillette's qualifications, and were Dr. Gillette's views seriously challenged by
contrary medical opinions or information, it might be argued that ALJ Lissek's reliance on Dr.
Gillette's RFC evaluation falls below the substantial evidence standard.  In this case, however,
Plaintiff presented no evidence to call Dr. Gillette's evaluation into question.

[29]  It appears that a State agency medical consultant reviewed the record on February 21,
2006, and concluded that Plaintiff retained the ability to perform light work, despite the
December 2005 MRIs.  (Tr. 231-232.)  Although that medical consultant's signature is illegible,
it is dated February 21, 2006, and appears on an adjacent page to a stamp which reads, "I have
reviewed all the evidence in the file, and the assessment of 9/13/05 is affirmed, as written."  (Tr.
231-32.)  However, ALJ Lissek's opinion does not indicate that he gave weight to the February
21, 2006 review of Dr. Wilchfort's RFC assessment by the unidentifiable consultant, so this
Court need not review whether it would have been error to do so.

20 C.F.R. § 404.1527(e)(2).  The ALJ must consider the State medical consultant's RFC evaluation only as opinion evidence to be used in his own determination, and is not bound by the State agency consultant's findings.  20 C.F.R. § 404.1527(f)(2)(i).  Here, ALJ Lissek noted that he considered Plaintiff's 2005 MRIs as evidence in making his own RFC determination, and stated that the findings of the State agency consultants were consistent with the rest of the evidence in the record.  (Tr. 17.)

Given the absence of medical evidence advanced by Plaintiff, Dr. Wilchfort's findings suggesting that Plaintiff suffers no severely limiting physical conditions, ALJ Lissek's determination that Plaintiff's statements of pain lack credibility, and the fact that the December 2005 MRIs did not indicate any impairments suggesting completely debilitating pain, ALJ Lissek's RFC determination was based on substantial evidence and is affirmed.

## IV. <u>CONCLUSION</u>

For the reasons stated above, this Court finds that the ALJ's decision is supported by substantial evidence and is affirmed.


 S/Joseph A. Greenaway, Jr._____
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: August 3, 2007